# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-01611-SCT

*CITY OF JACKSON, MISSISSIPPI, CITY OF
JACKSON POLICE DEPARTMENT AND ADRIAN
MAY*

*v.*

*ERIC LAW AND KRISTINA LAW*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/02/2009 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | PIETER JOHN TEEUWISSEN |
| | KIMBERLY CELESTE BANKS |
| ATTORNEY FOR APPELLEES: | WES W. PETERS |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 04/21/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLSON, P.J., LAMAR AND CHANDLER, JJ.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     In this Mississippi Tort Claims Act (MTCA) case, the City of Jackson appeals a

judgment against it for damages based upon a Jackson police officer's pursuit of a vehicle

that struck the vehicle occupied by Eric and Kristina Law, injuring both.  Because the record

supports the finding by the trial judge that the Jackson police officer acted in reckless

disregard for the public's safety, we affirm the judgment entered by the Circuit Court for the

First Judicial District of Hinds County.

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶2.    On June 11, 2006, Jackson Police Officer Adrian May spotted Carol Dearman driving a Jeep near the corner of Terry Road and Evergreen Avenue. Dearman was not driving recklessly. But, based on previous encounters with Dearman, May knew Dearman to be a drug-user and a prostitute. May also knew Dearman did not have a driver's license, nor did she maintain a permanent residence. On the other hand, May did not consider Dearman to be a physical danger to the public.

¶3.    May began to follow Dearman in his patrol car down Evergreen Avenue, and May activated his blue lights when he came to the intersection of Walnut Street and Winter Street. Also, May "chirped" his siren in an effort to stop Dearman, but she did not stop. May continued to follow Dearman east down Winter Street. He radioed dispatch that he was following a driver who would not stop. He informed dispatch of the Jeep's tag number and of the fact that a passenger was in the Jeep. He followed Dearman as she turned off Winter Street and proceeded south on Gallatin Street. As May continued his pursuit of Dearman, Dearman passed through several intersections controlled by traffic lights. She continued to ignore May's sirens and blue lights. May could not recall the color of these traffic lights, but he said he slowed down and checked for oncoming traffic as he proceeded through the intersections.

¶4.    The pursuit continued south on Gallatin Street until Dearman headed west on McDowell Road. At this point, May learned by radio that Dearman was driving a stolen Jeep. A slower-moving eighteen-wheeler traveling on McDowell Road ahead of Dearman forced

2

her to decrease her speed, thus permitting May to catch up to her. May's supervisor informed May through radio communications that he should let Dearman go if she was "blowing traffic lights." Although May testified on direct examination that he had not witnessed Dearman running red lights before his supervisor's order, on cross-examination, May answered affirmatively when asked whether Dearman already had run red lights by this point in the pursuit.

¶5.    Dearman turned from McDowell Road onto I-55 South,[1] where Dearman recklessly switched lanes[2] but had no close encounters with other vehicles. Shortly after entering I-55, Dearman exited on Daniel Lake Boulevard. According to May's testimony, Dearman was traveling forty-five-to-fifty miles per hour on Daniel Lake Boulevard, which had a posted speed limit of thirty-five miles per hour.  May also exited I-55 and followed Dearman west on Daniel Lake Boulevard, south on Terry Road, and west on Dona Avenue.

¶6.    May was not familiar with this area around Terry Road and Daniel Lake Boulevard, as he had crossed into another precinct. On Dona Avenue, May recognized that the area was residential and that people would have been present. At this point, he began to appreciate the dangerousness of the situation as Dearman sped through the residential area.[3] Accordingly,

---

[1]Dearman's speed on I-55 South was seventy to seventy-five miles per hour.

[2]May testified that Dearman had driven recklessly on I-55 South.

[3]The speed limit in the residential area was twenty-five miles per hour. May testified that he estimated Dearman's speed through this residential area to be "anywhere from 40, 50 miles an hour."

3

May decreased his speed, allowed Dearman to gain a few car lengths on him, but still attempted to keep sight of Dearman. He followed Dearman off Dona Avenue and north on Meadow Lane. May ran a red light on the corner of Cooper Road and Meadow Lane to keep sight of Dearman.

¶7.     May continued to follow Dearman down Meadow Lane, which  dead-ends into Woody Drive. As May turned west on Woody Drive, he lost sight of Dearman,[4] but a pedestrian pointed him in the direction of Monticello Drive. May's testimony at trial and the audiotape transcript reveal that, either adjacent to or on Monticello Drive,[5] May substantially decreased his speed and cut off his siren and lights. The audiotape transcript[6] reveals that thirty seconds after May cut off his siren, May radioed for an AMR J-1[7] because Dearman had crashed into the plaintiffs' vehicle at the intersection of McFadden and McDowell Roads.  Testimony at trial established that May eventually reached the accident site around four to five minutes after the accident. He was the second officer on the scene.

_____

[4]May testified that he had lost sight of Dearman on Woody Drive, approximately one mile from the accident, which occurred at the corner of McFadden and McDowell Roads. However, May also later testified that he had written in his narrative report after the accident that he had lost sight of Dearman on Monticello Drive.

[5]May testified affirmatively when asked whether his siren was still activated on Monticello Drive. However, later, May recanted this statement, saying that he was actually at the corner of Woody Drive and Meadow Lane, just close enough to see the street sign for Monticello Drive, when he still had his siren activated, thirty seconds before his radio transmission for an ambulance.

[6]The audiotape was received into evidence.

[7]"AMR J-1" means to send an ambulance immediately.

¶8.     May first encountered Dearman at the intersection of Terry Road and Evergreen Avenue, near Peabody Street. After this encounter, Dearman traveled seven miles before crashing at the corner of McFadden and McDowell Roads. May estimated that the pursuit lasted between five and six minutes. The audiotape of the pursuit reflects that five minutes and thirty-three seconds elapsed between the time May noticed Dearman driving the Jeep until May advised "Send AMR J-1."

¶9.     Throughout the pursuit, May never considered his knowledge of Dearman's characteristics or his knowledge of the places she frequented in determining whether to end the pursuit. May did not report to his supervisor his knowledge that Dearman was the driver. At trial, he admitted that the Jackson Police Department's pursuit policy was "boggy" to him.

¶10.    The Jackson Police Department has a written pursuit policy embodied in its General Order 600-20 to its officers. This pursuit policy will be discussed in more detail, *infra*, but suffice it to state here that the policy requires a police officer, *inter alia*, to perform a balancing test, weighing the immediate danger to the public and the officer by continuing the pursuit as opposed to terminating the pursuit and allowing a potentially dangerous suspect to remain at large.

¶11.    The procedure for terminating a pursuit includes "the complete withdrawal from and suspension of all following, tracking and attempts to apprehend. The officer(s) will either come to a complete stop in a safe location and await further instructions from the supervisor or travel in the opposite direction of travel from the pursuit." Furthermore, "A pursuit may

be terminated if the suspect's identity has been determined, immediate apprehension is not necessary to protect the public or officers, and apprehension at a later time is feasible."

¶12.    Steven Ashley, a retired law-enforcement officer from Michigan, testified for the plaintiffs. A police-pursuit expert, Ashley opined that May had authorization to attempt to stop Dearman by using his blue lights and siren. However, Ashley testified that May had a duty to reevaluate the pursuit as factors changed.  Ashley testified that May had erred by continuing to pursue Dearman because May knew Dearman and because May had no practical way of physically making her stop.  Ashley generally applied the ***Brister***[8] factors to the entirety of the pursuit in reaching this conclusion.  He also considered the Jackson Police Department's pursuit policy, which was memorialized in General Order 600-20. Ashley opined that the pursuit should have ended on Daniel Lake Boulevard or McDowell Road and opined that May had disregarded the public's safety by not terminating the pursuit.

¶13.    Mark Dunston, a law-enforcement officer since 1984 and the current deputy chief of police for the City of Ocean Springs, testified for the City of Jackson. He testified that May did not recklessly disregard the public's safety by continuing to pursue Dearman.  Dunston supported this by saying that May had acted reasonably by cutting off his lights and siren at some point adjacent to or on Monticello Drive when he had realized that he was not familiar with the residential area. Dunston also opined that May's actions did not proximately cause the plaintiffs' injuries.

---

[8]***City of Jackson v. Brister***, 838 So. 2d 274, 277-78 (Miss. 2003).

**DISCUSSION**

¶14. On appeal, the City of Jackson presents four issues: (1) whether the trial judge correctly found that May had acted with reckless disregard for the public's safety; (2) alternatively, whether the trial judge correctly found that May's actions had proximately caused the plaintiffs' damages; (3) whether the trial court erred in holding that Dearman was only sixty percent at fault for the accident; and (4) whether the trial judge erred in failing to find the plaintiff driver, Eric Law, to be contributorily negligent.

¶15. The standard of review for a judgment entered following a bench trial is clear. This Court has stated that "[a] circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Ellisville v. Richardson*, 913 So. 2d 973, 977 (Miss. 2005) (citing *Brister*, 838 So. 2d at 277-78) (citations omitted); *see also City of Greenville v. Jones*, 925 So. 2d 106, 109 (Miss. 2006), *overruled on other grounds by Joel v. Joel*, 43 So. 3d 424, 437-38 (Miss. 2010). "This Court reviews errors of law, which include the proper application of the Mississippi Tort Claims Act, de novo." *Richardson*, 913 So. 2d at 977.

I. **WHETHER THE TRIAL JUDGE ERRED IN FINDING THAT MAY HAD ACTED IN RECKLESS DISREGARD OF THE PUBLIC'S SAFETY BY CONTINUING THE PURSUIT.**

¶16. The Mississippi Tort Claims Act provides immunity to governmental entities and employees acting within the course and scope of employment duties. Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2002). Under the MTCA, however, a governmental entity may be held liable

where the officer acts in "reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of the injury." *Id.*

¶17.    "Reckless disregard is more than mere negligence, but less than an intentional act." *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 994 (Miss. 2003) (citing *Brister*, 838 So. 2d at 281). Reckless disregard occurs "when the 'conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved.'" *Durn*, 861 So. 2d at 995 (quoting *Maldonado v. Kelly*, 768 So. 2d 906, 910-11 (Miss. 2000)).

¶18.    This Court has addressed this particular issue under the MTCA on numerous occasions. In *Richardson*, an officer spotted a man with outstanding warrants traveling in the opposite direction. *Richardson*, 913 So. 2d at 976. The officer made a u-turn, activated his blue lights and siren, and began chasing the suspect north on Highway 29. *Id.* The plaintiff also was driving north and had begun making a left turn into a residential driveway when the suspect's car crashed into the plaintiff's car. *Id.* The evidence revealed the chase lasted for nine-tenths of a mile and occurred at night in a residential area on a hilly, curvy, two-lane road with medium traffic. *Id.* at 978. The officer was well-acquainted with the area and continued to pursue the suspect, although the suspect had run oncoming traffic off the road. *Id.* The suspect traveled at excessive rates of speed, and the officer had chased the suspect to the point of impact. *Id.* Ultimately, this Court found the officer had violated applicable pursuit policy by failing to weigh the seriousness of the offense against the risk

8

of harm to the public. *Id.* This Court held that the officer had acted in reckless disregard for the public's safety. *Id.* at 979.

¶19. In *Durn*, the plaintiff was driving south on Highway 49 while an officer was driving north on Highway 49 in his patrol car. *Durn*, 861 So. 2d at 993. After the officer and the plaintiff had passed each other, the officer saw a car speeding south. *Id.* Accordingly, the officer made a u-turn and began his pursuit of this speeding vehicle. *Id.* Eventually, the officer approached the plaintiff. *Id.* The officer attempted to pass the plaintiff, but the plaintiff "turned left across the northbound lane to enter the lot leading to the bus garage." *Id.* The plaintiff and the officer testified to different versions of the accident. *Id.* The plaintiff recalled that he had activated his turn signal, and the plaintiff's expert testified that the officer had been traveling eighty-one miles per hour. *Id.* The officer recalled at trial that he had not exceeded fifty-five miles per hour and had already "overtaken the northbound lane" in an attempt to pass the plaintiff when the plaintiff "crossed over into the northbound lane" and caused the accident. *Id.*

¶20. In its analysis, this Court canvassed relevant opinions, reviewing factual scenarios of officers recklessly disregarding the public's safety. *Durn*, 861 So. 2d at 995-96 (citing *City of Jackson v. Lipsey*, 834 So. 2d 687, 692-93 (Miss. 2003) (affirming a finding of reckless disregard when an officer suddenly turned his vehicle in front of oncoming traffic without having his headlights on or using his blue lights or siren); *City of Jackson v. Perry*, 764 So. 2d 373, 377-78 (Miss. 2000) (finding reckless disregard when an officer drove twenty-seven miles per hour over the posted speed limit without using his siren or blue lights while on his

9

way to dinner before colliding with a vehicle exiting a parking lot); ***Maye v. Pearl River County***, 758 So. 2d 391, 393-94 (Miss. 1999) (finding reckless disregard when an officer backed up an incline entrance to a parking lot, not knowing whether the area was clear)). After reviewing this precedent, the Court in ***Durn*** reasoned that the trial court had found that several ***Brister*** factors had been satisfied and that the record supported a finding that the officer had acted in deliberate disregard of a known risk by "attempting to overtake a vehicle that indicated it was turning . . . ." ***Durn***, 861 So. 2d at 996.

**A.**

¶21.     In reaching his conclusion in the present case that May had recklessly disregarded the public's safety, the trial judge considered several factors previously addressed by this Court (the ***Brister*** factors): (1) the length of the chase; (2) the characteristics of the streets; (3) the type of neighborhood; (4) the seriousness of the suspect's offense; (5) the experience and training of the officer; (6) whether the officer had available alternatives which would lead to the apprehension of the suspect besides the pursuit; and (7) the existence of police policy which prohibits pursuit under the circumstances. *See* ***Richardson***, 913 So. 2d at 977; ***Durn***, 861 So. 2d at 995; ***Johnson v. City of Cleveland***, 846 So. 2d 1031, 1037 (Miss. 2003); ***Brister***, 838 So. 2d at 280.[9]

_____

[9]While this Court in ***Richardson***, 913 So. 2d at 977, and in ***Johnson***, 846 So. 2d 1031, applied ten factors in its respective analyses, this Court has not specifically adopted these ten factors; rather as stated in ***Brister***, 838 So. 2d at 280, this Court has found them to be "instructive." In ***Richardson***, we stated that "[i]t is appropriate for trial courts to consider all ten factors, and to look at the totality of the circumstances when analyzing whether someone acted in reckless disregard." ***Richardson***, 913 So. 2d at 978. Since this Court has

10

¶22. Applying these factors, the trial judge found, among other things, that the plaintiffs had proven by a preponderance of the evidence that:

> Officer May pursued someone he knew and never believed to be a danger to the public, for seven miles through the streets of Jackson; that Officer May continued this pursuit through various types of neighborhoods, including a park on a Sunday afternoon (in which he anticipated children), across intersections of major streets and highways, through multiple traffic controlled intersections and on the Interstate. Officer May admitted that he had not been trained to apprehend a suspect through a pursuit. Officer May was simply pursuing Carol Dearman in the hope that she might, at some unknown and unidentified point, stop voluntarily. Despite the fact that he knew he had no way to stop her and that Ms. Dearman would not stop voluntarily, Officer May never considered the fact that he knew the suspect and had everything he needed to charge her, as the Jackson Police Department's policy directs. Officer May ignored his supervisor's directive to terminate the chase if they started going through lights, and then he proceeded to run a red light in an attempt to keep sight of Ms. Dearman through a neighborhood. Officer May never terminated the pursuit, pursuant to the Jackson Police Department's directives.
>
> Based upon the foregoing, it [is] the opinion of this Court that the Plaintiffs have shown, by a preponderance of the credible evidence, that the subject pursuit was conducted in reckless disregard of the safety of the public and that the negligent pursuit by JPD Officer May was a proximate contributing cause of the injuries and damages of the Plaintiffs; and, therefore, that the Plaintiffs are entitled to recover under the [MTCA] . . . ."

¶23. The trial judge further reasoned that May's actions were similar to the facts in **_Brister_**, in which this Court found that substantial evidence existed to support a finding of reckless disregard. **_Brister,_** 838 So. 2d at 276. In **_Brister_**, the suspect allegedly had forged a check, and the pursuit had lasted "less than 60 seconds over a distance of less than a mile in a

not held that all ten factors must be considered, this Court addresses only those factors that the trial court and parties addressed.

11

residential area and resulted in the suspect's crash with another vehicle." ***Richardson***, 913 So. 2d at 978 (citing ***Brister***, 838 So. 2d at 279). The trial court in ***Brister*** found the officer had acted recklessly because the pursuit had violated the "police department's general order, the officers were engaged in active pursuit up until the collision, the pursuit should have been terminated after the officers realized the suspect would not stop, and that the officers did not properly balance the public's safety versus immediate apprehension of a check forger." ***Id.***

¶24. This Court affirmed the trial court's findings. ***Brister***, 838 So. 2d at 281. We "anchored our decision on the fact that the officers involved in the chase were violating a departmental order that a pursuit may only be initiated when a suspect's escape is more dangerous to the community than the risk posed by the pursuit." ***Durn***, 861 So. 2d at 995.

**B.**

¶25. Applying the relevant factors, this Court finds that the record supports the trial judge's findings of fact and conclusions of law.

*1. Experience and Training of the Officer*

¶26. The City argues that, in ***Brister,*** this Court found that the officer had acted with reckless disregard because, *inter alia*, the officer was a rookie. May, however, "had been on the Jackson police force for more than a year and half assigned to Precinct 2, a high crime area with drugs, prostitutes, and gun fights." He also had attended training at the City of Jackson's Training Academy.

¶27. While not a rookie, May was not familiar with the police department's pursuit policy. He admitted the policy was "boggy" to him. He never had considered whether knowing the

suspect was an important factor in deciding whether to terminate a pursuit. He had not been trained in stopping a vehicle, and his only hope was that Dearman would stop voluntarily.

*2. Length of the Chase*

¶28.    Dearman fled for seven miles from the time May first spotted her until the accident occurred. The pursuit lasted five minutes and thirty-three seconds. The length of the chase supports the trial judge's view that May most likely knew for a large portion of the chase that Dearman was not going to stop voluntarily, increasing the risk of harm to the public.

*3. Types of Neighborhoods*

¶29.    The City contends that, in **Brister,** the pursuit route was through a densely populated area that included schools and parks. And in this case, the City argues that, on Sunday afternoon, little to no traffic was present throughout the entire pursuit, which spanned industrial areas, the interstate, and a small portion of a residential area in which May reasonably ended his pursuit.

¶30.    The record does reflect that portions of this pursuit spanned sparsely populated industrial areas. The pursuit began on the corners of Walnut and Winter Streets and continued into industrial areas on Gallatin Street and McDowell Road.

¶31.    After exiting from I-55 South and approaching the sixth mile of the pursuit, Dearman exited on Daniel Lake Boulevard and headed toward a residential area. May followed Dearman into this residential area, about which he admittedly knew little. This neighborhood contained a park, and May testified that he anticipated people's presence on a Sunday

13

afternoon. Throughout the entire pursuit, Dearman crossed six traffic-controlled intersections before the wreck occurred.

### 4. Street Characteristics

¶32.    The weather was sunny and the streets were dry. The area around Gallatin Street was not heavily populated. Plaintiffs' expert, Steven Ashley, testified that portions of McDowell Road were "hilly, bouncy, very rough." Gallatin Street was in disrepair, with large potholes. But no other testimony at trial revealed that the street conditions in the more populated areas of the pursuit were in great disrepair.

### 5. Possible Alternate Means of Apprehension

¶33.    May testified that he knew Dearman was driving the vehicle and knew the areas which Dearman frequented within his precinct. He also testified at trial that he had everything to charge Dearman with every crime for which she ultimately was charged prior to her entry on I-55 South. This evidence supports a finding that the Jackson Police Department feasibly could have apprehended and charged Dearman at a later time. *See Richardson*, 913 So. 2d at 978 (officer acted in reckless disregard by, *inter alia*, pursuing known suspect). The Jackson Police Department's Pursuit Policy specifically stated that a factor in favor of terminating a chase is whether the suspect's identity is known and apprehension at a later time is feasible.

### 6. The Seriousness of the Suspect's Offense

¶34.    May discovered that Dearman was driving a stolen vehicle midway through the pursuit. This crime is a felony, but not one of violence. This Court has addressed this factor

14

in conjunction with applicable pursuit policies. *See **Durn***, 861 So. 2d at 995 (citing ***Brister***, 838 So. 2d at 280). We agree with this approach, because the seriousness of the suspect's offense is an integral consideration in determining whether May acted in accordance with the Jackson Police Department's pursuit policy found in General Order 600-20.

*7. Jackson Police Department's Pursuit Policy – Balancing Test*

¶35.    The Jackson Police Department's pursuit policy requires an officer to ascertain whether the danger of the suspect's remaining at large outweighs the danger posed by the pursuit.

> The decision to initiate a pursuit must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large . . . .
>
> . . .
>
> The primary pursuing unit shall continually reevaluate and assess the pursuit situation, including, all of the initiating factors, and *terminate the pursuit whenever he or she reasonably believes the risks associated with the continued pursuit are greater than the public safety benefit of making an immediate apprehension*.

(Emphasis added.) If the danger to the public becomes too great, the officer must terminate the pursuit. Both experts at trial agreed that the danger is actual physical danger and not danger that the suspect might commit another property crime. The City argues that May balanced the public's safety with the apprehension of Dearman and terminated the pursuit when he deemed it unsafe to the public. The City states:

> Officer May made a decision after continuing to balance the risks to the public that the increased risks were becoming apparent when the pursuit: (1) entered

15

a residential neighborhood when he turned onto Dona Avenue; (2) Officer May was not familiar with the area; (3) Dearman was beginning to pick up her speed; and (4) the distance between their vehicles began to grow further and further apart.

The City adds that the plaintiffs' own expert could not provide a specific location at which the pursuit should have been terminated – only that it should have been terminated at some earlier point.

¶36. The City distinguishes *Brister* to show that the risk of a suspect remaining at large in the instant case was weighed correctly against the danger of the pursuit. In *Brister*, the suspect traveled at speeds as high as seventy to eighty miles per hour in a thirty-five- mile- per-hour zone, and the officers did not know their speeds. *Brister*, 838 So. 2d at 280. Moreover, the City argues that in *Brister*, expert testimony explicitly stated that the pursuit should have been terminated at a certain point – after the officers had turned onto Ridgewood Road in the middle of the day during the week in a highly populated area.

¶37. In contrast, as the City points out, May constantly communicated his speed to headquarters and did not exceed the speed limit by more than ten to fifteen miles per hour[10] at various points in the pursuit. In *Brister*, the suspect also drove recklessly at the beginning of the pursuit. *Brister*, 838 So. 2d at 277. But no evidence in this case suggests that Dearman had any close encounters with other vehicles. Accordingly, the City contends the risk inherent in this pursuit was less than the risk depicted in *Brister*.

---

[10]According to May's testimony, the only point at which Dearman traveled more than sixty miles per hour was on the interstate. The average speed of the pursuit exceeded sixty miles per hour.

¶38.    Also, the City takes great issue with the testimony of the plaintiffs' expert, Ashley. The City correctly states that Ashley did not testify that the pursuit should not have been initiated.  The City also argues that Ashley should never have been allowed to testify as an expert witness, because Ashley could not testify to a methodology pertaining to his results and conclusions. Therefore, the City argues that Ashley's conclusion regarding where the pursuit should have been terminated was not proper under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592-94, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

¶39.    Finally, the City argues that May was not engaged in active pursuit with Dearman up to the point of the collision. In support of this contention, the City points to two eyewitnesses, as well as Officer Kevin Gnash, who saw May at the intersection of the collision some four to five minutes after the stolen vehicle had entered the intersection of McDowell and McFadden Roads. The City also contends that May stopped his pursuit on Dona Avenue, one mile from the accident, when he lost sight of Dearman and began to decrease his speed.

¶40.    This Court finds that substantial evidence supports the trial judge's finding that May did not correctly weigh the dangers of Dearman remaining at large against the risk of harm to the public caused by the pursuit. Though Dearman was committing a felony, May testified that, based on his experiences with Dearman, he believed that she was not a danger to society. The record is also clear that May was not familiar with the Jackson Police Department's pursuit policy and continued to pursue a known suspect into a residential area – despite the fact that Dearman had driven recklessly on the highway, was becoming

17

increasingly reckless, and the circumstances indicated that she obviously was not going to yield to Officer May.

¶41. Moreover, May's supervisor told him to stop the pursuit if Dearman started running red lights. And according to May's testimony, Dearman already had run red lights. Nonetheless, May continued to pursue Dearman, because she was driving a stolen vehicle, knowing he had no way to make her stop. May even subsequently ran a red light to keep Dearman in sight. When May did realize that the pursuit was becoming dangerous, he did not follow protocol for terminating the pursuit.[11] Though he did not chase Dearman to the point of impact as in *Richardson*, the record reveals that only thirty seconds after he cut off his siren, the accident occurred.

¶42. This Court also finds that the City's opposition to the testimony of Ashley is without merit. Ashley was a qualified expert with years of experience in police pursuits. Ashley clearly stated that he generally applied the *Brister* factors and the Jackson Police Department pursuit policies in his analysis. While the City makes several arguments questioning Ashley's methodology, Ashley was thoroughly cross-examined, and the weight of Ashley's testimony was a credibility determination for the trier of fact. We have stated that "an expert's

---

[11] The procedure for terminating a pursuit includes "the complete withdrawal from and suspension of all following, tracking and attempts to apprehend. The officer(s) will either come to a complete stop in a safe location and await further instructions from the supervisor or travel in the opposite direction of travel from the pursuit." May did not withdraw. When he exited on Daniel Lake Boulevard and began to realize the situation's dangerousness, he allowed Dearman to move ahead only a few car lengths. On or near Monticello Drive, he cut off his lights and siren.

testimony is presumptively admissible when relevant and reliable." *Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 675 (Miss. 2010) (quoting *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (Miss. 2003)). "The weight and credibility of expert testimony are matters for determination by the trier of fact." *Id.* (quoting *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 747 (Miss. 2008)) (citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *McLemore*, 863 So. 2d at 36) (citations omitted).

## C.

¶43.    Although May eventually lost sight of Dearman, eventually realized the dangerousness of the situation, decreased his speed, and did not pursue Dearman directly to the crash site, this Court finds that substantial evidence exists to show that May acted in reckless disregard for the public's safety in light of the relevant circumstances.

¶44.    The trial court did not abuse its discretion in finding that, from the credible evidence, May violated several *Brister* factors. While "reasonable minds might differ on the question of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence." *Richardson*, 913 So. 2d at 978 (citing *Brister*, 838 So. 2d at 277-78). Because the trial court's findings are supported by substantial evidence and this Court's precedent, this Court affirms the trial court's finding that May recklessly disregarded the public's safety based on the manner in which he conducted his pursuit of Dearman.

19

**II.   WHETHER THE TRIAL COURT ERRED IN FINDING THAT OFFICER MAY'S ACTIONS WERE A PROXIMATE CONTRIBUTING CAUSE OF THE ACCIDENT AND RESULTING INJURIES TO THE PLAINTIFFS.**

¶45.   The City argues that, even if this Court finds that May acted in reckless disregard for the public's safety in his pursuit of Deaman, the plaintiffs still must show that May's reckless actions proximately caused the plaintiffs' damages. The trial judge stated that:

> Although Ms. Dearman was out of Officer May's sight, a short time, immediately prior to the collision, due to the high speed of travel of both May and Dearman and the length of the chase, it is the opinion of this Court that it was foreseeable that Dearman would continue to speed away from Officer May. The undisputed evidence shows that 1) Dearman sped through the red traffic light facing . . . the intersection where the accident occurred at a speed of more than fifty miles per hour; and that 2) it was apparent to an eyewitness that Dearman, immediately after the collision, appeared to be trying to run.

¶46.   In support of its argument that May's actions did not proximately cause the plaintiffs' injuries, the City cites the Mississippi Court of Appeals' decision in *Ogburn v. Wiggins*, 919 So. 2d 85 (Miss. Ct. App. 2005).  In *Ogburn*, an officer was traveling on a frontage road when a drunk driver ran the officer's patrol car off of the road. *Id.* at 87.  With blue lights ablaze and sirens going, the officer began to pursue the suspect. *Id.* The suspect ran a stop sign and turned onto an adjacent road. *Id.* The officer pursued the suspect over a hill on this adjacent road but quickly lost sight of the suspect. *Id.* The officer slowed and then "saw dust around an intersection" where the suspect had collided with another vehicle. *Id.* at 87-88.

¶47.   The Court of Appeals found that the officer had not acted with reckless disregard for the public's safety and that the officer had not proximately caused the accident. *Id.* at 92. The Court of Appeals reasoned that:

20

> Before the pursuit commenced, [the suspect] was driving in the wrong lane of traffic at an excessive speed while intoxicated . . . . There is simply no evidence in the record to establish whether the [suspect] knew he was being pursued. It simply cannot be said that this tragedy would not have occurred had [the officer] not pursued [the suspect].

***Id.***

¶48. The City argues that the instant case is analogous to ***Ogburn*** because "there was no evidence placed in the record that the suspect driver had any knowledge of the pursuit." Specifically, the City argues Dearman did not testify, so no evidence shows whether Dearman knew or thought that May was still behind her in the last mile of the pursuit.

¶49. Moreover, the City argues that, because May had terminated his pursuit of Dearman one mile before the accident after losing sight of Dearman, May's actions could not be the proximate cause of the accident. May was the second officer who arrived at the accident scene. Specifically, the City contends that May "was not in active pursuit of Dearman and was more than enough mile(s) back from Dearman not to be the proximate cause." The City points out that the plaintiffs' expert, Ashley, testified that he did not know what Dearman would have done differently if May had stopped the pursuit at either McDowell Road or Daniel Lake Boulevard. And the City's expert, Dunston, testified that Officer May's actions were not the proximate cause of Dearman's accident with the plaintiffs.

¶50. In contrast, the plaintiffs argue that May's actions did proximately cause the accident and their resulting injuries, and the plaintiffs attempt to distinguish ***Ogburn*** from their case. The plaintiffs contend that, in ***Ogburn***, "the proof showed the asserted pursuee . . . was driving above the speed limit in the wrong lane of traffic before [the suspect] first

21

encountered the officer" when the suspect first ran the officer off the road. Yet, in this case, the plaintiffs contend that Dearman was driving safely before the pursuit began and was not endangering anyone. She had stopped at a stop sign and had obeyed the rules of the road before the pursuit. Moreover, the plaintiffs contend that "there was never any doubt that Ms. Dearman knew that Officer May was behind her pursuing her."

¶51. And to further support their proximate-cause argument, the plaintiffs contend that Dearman became increasingly reckless throughout the pursuit. Once the pursuit began, Dearman started to speed away from May. She drove recklessly on I-55 South. She passed through several traffic-controlled intersections. When she exited on Daniel Lake Boulevard, she picked up her speed and pulled away from May.

¶52. Meanwhile, May followed Dearman with his siren and blue lights activated until within one mile of the accident site and stopped his pursuit and turned off his siren and lights only when he lost sight of Dearman, thirty seconds prior to the crash. Simply stated, according to the plaintiffs, "the one and only thing that ever made Carol Dearman in any way dangerous to the public was the chase itself, and the more Officer May continued to pursue Ms. Dearman, the more dangerous she became."

¶53. This Court has addressed proximate cause on numerous occasions. In *City of Jackson v. The Estate of Stewart*, 908 So. 2d 703, 712-13 (Miss. 2005), we distinguished between foreseeability (proximate cause) and the question of causation (but/for):

> We wish to emphasize that the question of foreseeability is different from the question of causation. The causation question is whether the City's negligence caused or substantially contributed to [the plaintiff's injury]. . . .

. . .

> By contrast, forseeability presents the question of whether [the injury] is the type of damage which reasonably should be *anticipated* (or foreseen before the fact) as a result of [the negligent act].

In **Stewart**, the issue was whether a bus driver who had delivered an elderly woman to a day-care center and had left her unattended had proximately caused this woman to fall and subsequently to have a stroke. **Id.** at 712. This Court found that, while the bus driver was a cause-in-fact of the woman's injury, the bus driver was not the legal or proximate cause, because her injury was not foreseeable. **Id.** at 715.

¶54. On the other hand, in today's case, May's actions substantially contributed to the plaintiffs's injuries – despite the fact that May had stopped pursuing Dearman one mile from the site of the accident. This Court finds that the evidence supports the trial judge's finding that Dearman knew that May was following her. As the learned trial judge explained, the pursuit lasted for seven miles, and the record confirms that the longer May chased Dearman, the more reckless her driving became. And Dearman likely would not have noticed May slow down or cut his sirens because, while May had decreased his speed, May also had lost sight of Dearman because of the curvy nature of the neighborhood roads. The record supports a finding that Dearman never saw May cut off his siren or lights. May's losing visual contact with Dearman thus did not constitute a break in the chain of events sufficient to negate May's contribution to the plaintiffs' injuries. Only thirty seconds after May had deactivated his siren, Dearman's vehicle collided with the plaintiffs' vehicle. The record supports a finding that May's actions substantially contributed to the plaintiffs' injuries.

23

¶55. Moreover, Dearman's collision with the plaintiffs' vehicle was foreseeable to May, who testified at trial that he had recognized the pursuit was becoming dangerous not only to other drivers but to pedestrians. Hence, we affirm the trial judge's finding that May had recklessly disregarded the public's safety by failing to weigh correctly the danger of the pursuit with the risk of Dearman being at large.

¶56. For the reasons discussed, we affirm the trial judge's finding not only that May's actions substantially contributed to the plaintiffs' injuries, but that May likewise should have reasonably anticipated the type of harm to the plaintiffs due to his actions.

### III. WHETHER THE TRIAL COURT ERRED IN FINDING THAT DEARMAN WAS ONLY SIXTY PERCENT AT FAULT FOR THE ACCIDENT.

¶57. Stemming from the City's substantial-contributing-cause argument, the City contends that the trial court erred by finding that Dearman was only sixty percent at fault for the accident. In support of this contention, the City states that "[b]ecause of the actions of Dearman and her disregard of law enforcement and her voluntary guilty plea to aggravated assault, the City of Jackson respectfully submits that she was the significant proximate cause of the collision."

¶58. This Court finds this issue to be without merit. The trial judge's finding actually reflects that Dearman was the significant cause of the accident, because he found her to be sixty percent at fault. Moreover, an allocation of forty percent negligence to May is supported by substantial evidence in the record. Again, May recklessly disregarded the public's safety by the manner in which he conducted his pursuit of Dearman.

24

### IV. WHETHER THE TRIAL COURT ERRED WHEN IT FOUND THAT PLAINTIFF ERIC LAW WAS NOT CONTRIBUTORILY NEGLIGENT.

¶59. The trial judge found by a preponderance of the evidence that the plaintiff driver, Eric Law, "was guilty of no negligence which proximately caused or contributed to the accident. . . . Officer May concluded that there was no improper driving by Eric Law."

¶60. The City contends that the trial court erred by finding that Law was not contributorily negligent and argues that Law was twenty-five percent responsible for the accident. Based on Officer Kevin Gnash's testimony, the City states that, as Officer Gnash approached the intersection[12] of McDowell and McFadden Roads with his blue lights engaged, the Law vehicle turned in front of Officer Gnash's patrol car. Also two witnesses, Jacqueline Johnson and Nicholas Thomas, testified that they saw Gnash's patrol car with its blue lights engaged, and Johnson "took caution at the intersection" and did not "proceed when the light" became green.

¶61. Citing **Busick v. St. John**, 856 So. 2d 304, 307 (Miss. 2003), the City states that "Mississippi law holds that a motorist's right to assume that the driver of a vehicle proceeding toward an intersection will obey the law of the road extinguishes when the motorist knows or in the exercise of care should know the proceeding vehicle will not stop."

---

[12]Officer Gnash witnessed the accident. He had heard via radio communications that the pursuit was entering his precinct and he thus had begun traveling west on McDowell Road between two and five miles per hour, with his blue lights engaged, to caution the public.

And under Mississippi Code Section 63-3-809[13] Law "should have approached Officer Gnash's vehicle with due caution, yield[ed] the right of way, and be[en] prepared to stop to his blue lights."

¶62.   Essentially, the City contends that Law did not proceed with caution or take any precautionary measures. The City ultimately reasons that Law was a substantial cause of the accident because, if he had kept a proper lookout and had heeded Officer Gnash's blue lights, the accident would not have happened.

¶63.   We believe that the trial judge's finding that Law was not contributorily negligent is supported by substantial evidence. In May's accident report, when describing Law's driving, May wrote "No apparent improper driving." In addition, the record is clear that Law was making a left-hand turn, attempting to head north, and proceeding via a green light from McDowell Road onto McFadden Road. Although very close to the intersection, Officer Gnash's patrol car was not in the intersection, and his sirens were not activated. Gnash's supervisor had instructed him not to become involved in the pursuit. Gnash testified that he was attempting to "slow traffic" and was not planning to enter the intersection. He was at the intersection for less than a minute before the accident occurred.  Neither Law nor his wife

---

[13]Mississippi Code Section 63-3-809 states, in part: "(d) upon approaching a stationary authorized emergency vehicle, when such vehicle is giving a signal by use of flashing, blinking, oscillating, or rotating lights, a person who drives an approaching vehicle shall: i. Proceed with due caution, yield the right of way . . . ." Miss. Code Ann § 63-3-809 (Rev. 2004).

26

testified that they had heard police sirens or had seen Gnash's patrol car approaching the intersection before they turned. This Court finds the record contains insufficient evidence to indicate that Law acted negligently in light of all the relevant facts.

¶64.    The trial judge's finding that Law did not act negligently is based on "substantial, credible, and reasonable evidence." *Perry*, 764 So. 2d at 376 (Miss. 2000). Accordingly, the trial judge did not err by concluding that Law was not contributorily negligent.

## CONCLUSION

¶65.    Based on today's discussion, the judgment against the City of Jackson in favor of Eric Law in the sum of $250,000, and in favor of Kristina Law in the sum of $250,000, plus post-judgment interest, as entered by the Circuit Court for the First Judicial District of Hinds County, is affirmed.

¶66.    **AFFIRMED.**

**WALLER, C.J., RANDOLPH, LAMAR, KITCHENS AND CHANDLER, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PIERCE, J.  KING, J., NOT PARTICIPATING.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶67.    My disagreement with the majority should come as no surprise, since today's case is not my first disagreement with this Court's willingness to both ignore decades of precedent and substantially dilute the plain meaning of the phrase "reckless disregard."[14]  And under similar facts, I shall continue to dissent until the Legislature changes the statute, this Court

---

[14] *City of Ellisville v. Richardson*, 913 So. 2d 973 (Miss. 2005).

changes direction, or Webster redefines "reckless disregard" to mean what the majority claims it means.

¶68. The Mississippi Tort Claims Act (MTCA) – with one exception – provides immunity to police officers acting within the scope of their duties. That exception is where the officer acted "in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of the injury."[15]

¶69. Our precedent holds that "reckless disregard is a higher standard than gross negligence and 'embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.'"[16] This Court has held that "'wanton' and 'reckless disregard' are just a step below specific intent."[17] Indeed, reckless disregard requires that "conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved."[18]

¶70. Officer May began pursuing Dearman in sparsely populated industrial areas. He never traveled more than fifty miles per hour on city streets, or seventy miles per hour on a short span of Interstate 55 South. The uncontradicted evidence shows that, as soon as Officer

---

[15] Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2002).

[16] *Collins v. Tallahatchie County*, 876 So. 2d 284, 287 (Miss. 2004) (quoting *Turner v. City of Ruleville*, 735 So. 2d 226, 230 (Miss. 1999)).

[17] *Turner v. City of Ruleville*, 735 So. 2d at 230; *see also* *Evans v. Trader*, 614 So. 2d 955, 958 (Miss. 1998).

[18] *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 995 (Miss. 2003) (quoting *Maldonado v. Kelly*, 768 So. 2d 906, 910-11 (Miss. 2000)).

May approached a residential area, he decreased his speed and pulled back from Dearman while unsuccessfully attempting to keep her in sight. A pedestrian pointed him in the direction of Monticello Road. Officer May proceeded to Monticello Road, substantially decreasing his speed and deactivating his blue lights. These are the facts upon which the majority finds Officer May acted in reckless disregard of the public's safety.

¶71. It can be argued that Officer May was negligent under the circumstances – perhaps even grossly negligent. But these facts are not even close to the MTCA's requirement of reckless disregard. And because the record does not support the trial judge's finding that Officer May acted in "reckless disregard for the safety of the public," I respectfully dissent.

**PIERCE, J., JOINS THIS OPINION**.