# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00643-COA

**BRITTANY LEE BERRY**                                                                    **APPELLANT**

**v.**

**JACKSON COUNTY, MISSISSIPPI**                                                    **APPELLEE**

DATE OF JUDGMENT:                    05/08/2023
TRIAL JUDGE:                               HON. STEPHEN B. SIMPSON
COURT FROM WHICH APPEALED:    JACKSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          ROSS JONATHAN FRANCO
ATTORNEYS FOR APPELLEE:          WILLIAM ROBERT ALLEN
                                                JACKYE C. BERTUCCI
                                                JAMES H. COLMER JR.
                                                LANCE WESLEY MARTIN
NATURE OF THE CASE:                  CIVIL - PERSONAL INJURY
DISPOSITION:                              AFFIRMED - 12/03/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McCARTY AND EMFINGER, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Brittany Berry was injured when a vehicle driven by a person fleeing law enforcement struck her vehicle.  She filed suit for damages under the Mississippi Tort Claims Act (MTCA), alleging that the law enforcement officers acted with reckless disregard for her safety.  The circuit court granted summary judgment in favor of the defendants, and Berry appealed.  Finding that the circuit court appropriately granted summary judgment, we affirm.

## FACTS

¶2.     On Monday, October 24, 2016, Captain James Sears with the Jackson County Sheriff's Department was working an interstate detail on I-10 called Operation Stonegarden,

a grant program intended to curtail human traffickers, drug traffickers, and wanted persons. Sears testified that while he was stationed in east Jackson County, he received a notification that an Alabama license plate reader had identified a vehicle with a license plate registered as stolen. The vehicle was crossing into Mississippi on I-10 going west. Sears spotted a silver Ford Ranger with the matching license plate number. The license plate was registered to a white 2007 GMC.[1] The driver was later identified as Carl Young Jr. A female passenger was seated in the front seat next to Young.

¶3. At approximately 7:15 p.m., Sears began following the Ford Ranger at mile marker 61 (approximately four miles east of D'Iberville, Mississippi) and called for backup. He waited to activate his blue lights and siren until he confirmed that other officers were available to assist him with a traffic stop. Jackson County Sheriff's Deputies John Hampton and Trung Nguyen were seven miles away at mile marker 54. Sears saw them at approximately 7:20 p.m. He activated his blue lights and siren at mile marker 54 and attempted a traffic stop. Young did not stop but increased his speed to 85 or 90 miles per hour in a 70-mile-per-hour zone. Sears determined that a pursuit was warranted because the driver was actively fleeing law enforcement. Sears and Nguyen pursued Young for the next four miles on the interstate. Hampton followed, using his vehicle as a "rolling barrier" to prevent traffic from approaching the chase. As they approached Exit 50 in Ocean Springs, Sears noted that traffic was becoming "more congested," and Young was driving more erratically. Sears "went around the vehicle and attempted to perform a rolling block," but

---

[1] While the Ford Ranger was later discovered to be stolen, the information that Sears had at the time was only that the license plate was stolen.

2

Young exited the interstate at Exit 50 onto Washington Avenue in Ocean Springs. He ran the red light at the top of the exit at the intersection of Washington Avenue and Highway 609, crossed six lanes of traffic, jumped a curb, and immediately re-entered I-10 west via the entrance ramp from Washington Avenue.

¶4. Jackson County Sheriff's Department Sergeant Michael Nutefall and Deputy Nathan Fisher were near the I-10 entrance ramp at Washington Avenue and continued the pursuit. Sears, Hampton, and Nguyen followed. Jackson County dispatch notified the D'Iberville Police Department that the pursuit was headed toward D'Iberville. The pursuit then continued westbound on the interstate for another four miles toward Exit 46 in D'Iberville, which is in Harrison County. Wanting to keep Young on the interstate, Nutefall positioned his vehicle in front of Young's vehicle in an attempt to perform a second rolling roadblock. Young swerved into the grass and exited at mile marker 46. Young drove up the ramp and attempted to turn right onto Lamey Bridge Road going south. However, Young crashed into the guardrail and stopped.

¶5. D'Iberville Police Officer Willis Krahenbuhl was traveling north on Lamey Bridge Road when he saw Young crash into the guardrail. Krahenbuhl testified that he pulled his patrol car in front of Young's stopped vehicle at a forty-five-degree angle to block it in, and Fisher angled his patrol car against the passenger door of the vehicle to prevent it from being opened. Nutefall pulled up behind the vehicle and got out to apprehend the driver.

¶6. Fisher testified that as Nutefall approached, Young backed up and drove forward, striking Krahenbuhl's vehicle. Nutefall then began yelling at the driver to exit the vehicle.

3

Nutefall testified that he feared for his life, and he drew his service weapon and fired three rounds at Young's vehicle. Young then drove forward between Krahenbuhl's and Fisher's vehicles and proceeded south on Lamey Bridge Road. Fisher followed. Fisher testified that he pursued the vehicle south on Lamey Bridge Road at speeds of 40 to 50 miles per hour in a 35 mile-per-hour zone.

¶7.    After Young had traveled approximately 0.6 miles on Lamey Bridge Road, he ran a red light at the intersection of Lamey Bridge Road and Popps Ferry Road. Fisher testified that at the same time, Berry was in her vehicle turning left through the intersection onto northbound Lamey Bridge Road from southbound Popps Ferry Road. Fisher testified that Berry had the green light. When Young ran the red light, his vehicle T-boned Berry's vehicle in the center of the driver's side. Fisher testified that during the entire pursuit on Lamey Bridge Road, he never saw the brake lights activate on Young's vehicle. According to Fisher, Young continued to flee, and he turned west onto Bachman Road "just around the corner from where [the] impact took place." A short distance later, Young drove the vehicle off the road, and he and the passenger exited the vehicle, ran, and jumped over a small fence into a residential yard.

¶8.    Fisher exited his patrol car and followed the suspects into the woods, where they stopped running. Young followed Fisher's command to raise his hands, but the female passenger did not. She faced away from Fisher, and Fisher could only see her right hand. She began to turn and move her right hand. Believing she may have a weapon and that his life was in danger, Fisher fired at the female. Both suspects got on the ground. When

4

backup officers arrived, Fisher detained both suspects without incident, and the female passenger received medical treatment.

## PROCEDURAL HISTORY

¶9. On October 23, 2017, Berry filed a complaint under the MTCA in the Harrison County Circuit Court against Jackson County and the City of D'Iberville. *See* Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2019). Berry alleged that officers with the Jackson County Sheriff's Department and City of D'Iberville Police Department, while acting in the course and scope of their employment, disregarded standard operating procedures and proper protocols in pursuing Young. Berry alleged that the officers demonstrated a reckless disregard for her safety and well-being during a time when she was not engaged in a criminal activity and that as a direct and proximate result of their actions, she suffered bodily injury and was entitled to damages.

¶10. In February 2019, after discovery, Berry moved to dismiss with prejudice the City of D'Iberville as a party, and the circuit court granted the motion. The circuit court then granted Jackson County's motion to transfer the case to Jackson County, per the venue requirements of the MTCA. Miss. Code Ann. § 11-46-13(2) (Rev. 2019). Once transferred, all Jackson County Circuit Court judges recused, and a special judge was appointed.

¶11. On April 15, 2020, Jackson County moved for summary judgment, arguing that (1) it was immune from liability under the police-function exemption of the MTCA; (2) Berry failed to show the officers acted with reckless disregard for her safety; (3) two distinct pursuits occurred, neither of which demonstrated reckless disregard; and (4) no genuine issue

5

of material fact existed. Berry filed a response in opposition. A hearing was held in July 2020.

¶12. On May 8, 2023, the circuit court entered an order granting summary judgment in favor of Jackson County. The circuit court adopted Jackson County's proposed findings of fact and conclusions of law, holding that the MTCA police-function exemption barred Berry's claims. She appeals.

**STANDARD OF REVIEW**

¶13. This Court "reviews a trial court's grant or denial of summary judgment de novo." *Yazoo City v. Hampton*, 386 So. 3d 355, 357 (¶13) (Miss. 2024). The MTCA provides governmental entities and their employees immunity from liability under certain circumstances. *Mitchell v. City of Greenville*, 846 So. 2d 1028, 1029 (¶8) (Miss. 2003). Immunity under the MTCA "is an entitlement not to stand trial rather than a mere defense to liability and . . . should be resolved at the earliest possible stage of litigation." *Id.* "[I]mmunity is a question of law and is a proper matter for summary judgment . . . ." *Id.* "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact.'" *Hampton*, 386 So. 3d at 357 (¶13) (quoting M.R.C.P. 56(c)). "The evidence must be viewed in the light most favorable to the opposing party." *Id.*

¶14. The moving party "bears the burden of persuading the trial judge that: (1) no genuine issue of material fact exists, and (2) on the basis of the facts established, [it] is entitled to

6

judgment as a matter of law." *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (¶11) (Miss. 2013). A nonmoving plaintiff "carries the burden of producing sufficient evidence of the essential elements of her claim at the summary-judgment stage, as she would carry the burden of production at trial." *Id.* at 89 (¶13).

## DISCUSSION

### I.      Reckless Disregard

¶15.     Berry argues that her MTCA claim survives summary judgment because a genuine issue of material fact exists regarding whether the Jackson County officers acted with reckless disregard for her safety and well-being.

¶16.     Under the MTCA, a governmental entity and its employees acting within the course and scope of their employment are generally immune from claims "[a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection . . . ." Miss. Code Ann. § 11-46-9(1)(c). "This exemption from liability, however, does not apply to acts or omissions performed in 'reckless disregard' for the safety and well-being of one not engaged in criminal acts." *City of Jackson v. Gray*, 72 So. 3d 491, 495 (¶13) (Miss. 2011). "Although the MTCA does not define reckless disregard, our caselaw instructs that reckless disregard is a higher standard than gross negligence and that it involves willful or wanton conduct which requires knowingly or intentionally doing a thing or wrongful act." *Id.* at 495-96 (¶13). "Cases brought under the tort claims act are subject to a bench trial, with the judge sitting as both the finder of fact and law." *Phillips v. City of Oxford*, 368 So. 3d 317, 326

(¶32) (Miss. 2023) (citing Miss. Code Ann. § 11-46-13(1) (Rev. 2019)).

¶17.    "By requiring a finding of 'reckless disregard of the safety and well-being of others,' the Legislature set an extremely high bar for plaintiffs seeking to recover against a [county] for a [law-enforcement] officer's conduct while engaged in the performance of his or her duties.    The [county] is immune from liability for acts of negligence, and even gross negligence is not enough." *City of Jackson v. Presley*, 40 So. 3d 520, 523 (¶12) (Miss. 2010).  To find reckless disregard, the plaintiff must prove that the governmental employee acted with "a conscious indifference to consequences, amounting almost to a willingness that harm should follow." *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 995 (¶10) (Miss. 2003).  Reckless disregard is shown where the action or inaction of a law enforcement officer "evinces an entire abandonment of any care." *Presley*, 40 So. 3d at 523 (¶12).

¶18.    Our Supreme Court has set out ten factors to be considered in determining whether reckless disregard occurred in the context of a police pursuit: (1) the length of the pursuit; (2) the type of neighborhood; (3) the characteristics of the streets; (4) the presence of vehicular or pedestrian traffic; (5) the weather conditions and visibility; (6) the seriousness of the offense for which the police are pursuing the suspect; (7) the officers' use of sirens and blue lights; (8) available alternatives that would lead officers to the apprehension of the suspect besides pursuit; (9) the existence of a police policy that prohibits pursuit under the circumstances; and (10) the rate of speed of the officers in comparison to the posted speed limit. *City of Ellisville v. Richardson*, 913 So. 2d 973, 977 (¶15) (Miss. 2005).  "It is appropriate for trial courts to consider all ten factors, and to look at the totality of the

8

circumstances when analyzing whether someone acted in reckless disregard." *Id.* at 978 (¶17).

¶19.    In addition to the law, Jackson County had a pursuit policy that required officers to "use their best discretion and judgment when conducting emergency vehicle pursuits." Many of the policy factors overlap with the *Richardson* factors. Relevant to the claims Berry raised, the policy required that the officer initiating the pursuit consider the following:

> 2.    The decision to initiate pursuit is based on:
>
> > a.    Officer's actual or constructive knowledge that a serious violation of the law has, or is about to occur;
> >
> > b.    The officer's conclusion that the immediate danger to the public or the officer created by the pursuit, is less than the immediate or potential danger to the public should the suspect remain at large.
> >
> > c.    Suspect exhibits intention to avoid apprehension by refusing to stop when properly directed to do so.

We shall address each of the *Richardson* factors, including Jackson County's department policy, and consider the totality of the circumstances.

### A.    *Richardson* Factors

#### 1.    Length of the Pursuit

¶20.    Beginning when Captain Sears activated his blue lights, the pursuit spanned approximately 8.6 miles and lasted approximately seven minutes. The first eight miles of the pursuit occurred on the interstate, and the final 0.6 miles occurred on Lamey Bridge Road in D'Iberville.

¶21.    Berry argues that Mississippi courts have found reckless disregard in pursuits that

9

were shorter in time and distance. In support of her argument, Berry cites *City of Jackson v. Brister*, 838 So. 2d 274, 279 (¶17) (Miss. 2003) (less than a mile pursuit lasting forty-to-sixty seconds); *Hill v. Hinds County*, 237 So. 3d 838, 840 (¶3) (Miss. Ct. App. 2017) (3.75-mile pursuit lasting five minutes); *City of Jackson v. Law*, 65 So. 3d 821, 825 (¶8) (Miss. 2011) (seven-mile pursuit lasting five-to-six minutes); *Richardson*, 913 So. 2d at 978 (¶17) (nine-tenths of a mile pursuit occurring at night); and *City of Jackson v. Lewis*, 153 So. 3d 689, 696 (¶14) (Miss. 2014) (1.8-mile pursuit lasting four minutes).

¶22. However, none of the cited cases hinged on the length or distance of the pursuit in finding reckless disregard. In *Brister*, the Supreme Court found reckless disregard because the officers initiated the pursuit with a "conscious indifference" to department policies, among other factors. *Brister*, 838 So. 2d at 281 (¶23). Officers received a call from a bank at 11 a.m. on a weekday informing them that a known individual was attempting to cash a forged check. *Id.* at 267-77 (¶¶6-7). Despite the suspect's car being the only vehicle in the bank parking lot, the officers parked next to the suspect's car instead of blocking it in, easily allowing the suspect to back out of the parking space and flee. *Id.* at 280 (¶21). A one-month rookie officer "involved in his first hot pursuit and totally unfamiliar with the area" took the lead as the suspect traveled through a "heavily populated" area. *Id.* "The route took them through residential areas including apartment complexes, single-family housing and condominiums, a park, and even past an elementary school traveling in a 35 miles per hour zone at speeds in excess of 55 miles per hour. The suspect was traveling at times in excess of 70 or 80 miles per hour," ultimately crashing into a vehicle and fatally injuring its driver.

10

*Id.* at 276, 280 (¶¶1, 21). The officers violated department policies by failing to consider alternatives, such as writing down the suspect's tag number or blocking the vehicle while it was in the bank's parking lot, and the officers failed to balance the public's safety versus the seriousness of the offense (check forgery). *Id.* at 279 (¶20).

¶23. In *Hill*, this Court reversed and remanded a grant of summary judgment in favor of Hinds County because "factual disputes persist[ed]" regarding whether law enforcement acted in reckless disregard for Hill's safety. *Hill*, 237 So. 3d at 843 (¶15). Hill sued for injuries he sustained when he was pursued by officers and hit another car in an intersection. *Id.* at 841 (¶¶5, 7). Hill disputed that he engaged in careless or reckless driving, which was the reason for the pursuit but an offense for which Hill was never charged. *Id.* at 843 (¶20). Further, the parties disputed whether the officers "terminated the pursuit" before the crash or, as Hill claimed, "continued their pursuit with blue lights staying 'right on' Hill until the deputies purportedly 'bumped' his vehicle, causing it to collide with another vehicle." *Id.* at (¶15). This Court found that "[b]ased on the contested facts, triable issues of material fact exist." *Id.* at 844 (¶22).

¶24. In *Richardson*, reckless disregard was found where the pursuit occurred at night in a residential area; the officer continued the pursuit even "after Evans[, the suspect,] had run oncoming traffic off the road"; the officer continued the pursuit "while Evans weaved in and out of traffic at excessive speeds and endangered the safety of innocent citizens"; and the pursuing officers knew Evans, "knew where Evans lived, knew Evans's mother, and knew that Evans was likely to try to avoid arrest which he did even after colliding with [the

victim's] vehicle." *Richardson*, 913 So. 2d at 978 (¶17). The Supreme Court found that these facts provided substantial and credible evidence to support a finding of reckless disregard of the officer's duty to balance the public's safety with the immediate need to apprehend the suspect. *Id.* at 979 (¶21).

¶25. Finally, in *Lewis*, the Supreme Court determined that substantial evidence supported a finding of reckless disregard where "Officer Jackson observed Butler violating a traffic ordinance, which was a misdemeanor offense, by turning off his car's headlights and making a U-turn, ostensibly to avoid a police roadblock." *Lewis*, 153 So. 3d at 700 (¶28). The officer pursued Butler "for approximately 1.2 miles at a relatively moderate speed" at night. *Id.* "Officer Jackson testified that he ran three red traffic lights and two stop signs in pursuit of Butler's car, knowing that the headlights on Butler's car were not illuminated." *Id.* Officer Jackson could have "relay[ed] the tag number of Butler's vehicle to dispatch, but chose not to do so." *Id.* The "[m]ost egregious" action was the officer's "wanton defiance" of his superior's directive to terminate pursuit and "his failure to comply with the standard . . . for communicating termination to the pursued party." *Id.* at (¶29).

¶26. Berry does not cite any caselaw or record evidence that the length of the pursuit in this case demonstrated reckless disregard. Further, no material fact is in dispute regarding the length of the pursuit. Because Berry has presented no evidence that the length of the pursuit was inherently reckless or is in dispute, we cannot find that a genuine issue of material fact exists as to this factor.

### 2. Type of Neighborhood

12

¶27.    For approximately eight miles, the pursuit occurred on the interstate.  The pursuit briefly left the interstate at Exit 50 in Ocean Springs, where Young ran a red light, crossed six lanes of traffic on Washington Avenue, and immediately re-entered the interstate.  For the final 0.6 miles, the pursuit took place through a mixture of commercial and residential areas on Lamey Bridge Road in D'Iberville.

¶28.    Officers recognized that pursuing Young off the interstate was more risky, and they made efforts to keep Young on the interstate.  Captain Sears with the Jackson County Sheriff's Department, who initiated the pursuit, unsuccessfully attempted to perform a rolling roadblock before the Biloxi exit, and Sergeant Nutefall unsuccessfully attempted to perform a rolling roadblock before the D'Iberville exit.  Nutefall testified, "I knew we was coming up to D'Iberville.  My intention is to keep him on the interstate. . . .  So I get in front of him and try to keep him on the interstate.  I didn't want him to get off the exit."

¶29.    Nutefall was asked about the specific dangers of the pursuit proceeding into D'Iberville and, specifically, southbound onto Lamey Bridge Road.  Nutefall replied:

> Well, my main concern was where the heavy population is.  I wasn't thinking about the southbound because the only thing there is a skating rink, and I don't even remember what day of the week it was, but I knew going north would be a more heavily populated traffic area.

¶30.    When Sergeant Ken Moran, commanding officer of the D'Iberville Police Department, was asked about the "specific dangers about carrying on a pursuit in D'Iberville where this pursuit actually occurred," he testified generally regarding the area:

> Shopping.  And there's . . . I want to say three major intersections right there.  And just south of that general location, it comes into a school area.  So I'm not sure if they had, like, a baseball game or a game going on that night.  I don't

13

think there was. But sometimes they have, like, practice and stuff going out there. Also, to the east side of that is a neighborhood, a subdivision, so those were some other factors. Oh, the skating rink. Yeah, the skating rink right there, that place stays jammed up. Churches, like, all kind of stuff in that area.

D'Iberville Officer Travis Sorenson, who was positioned "on the bottom of the I-10 eastbound on-ramp from Lamey Bridge Road" and drove to the scene of the accident after the pursuit ended, was also asked about the area:

Q.    Going down into D'Iberville, down Lamey Bridge Road, towards Popps Ferry Road, as this pursuit—that's the path this pursuit took, would you consider that area between Lamey Bridge Road, down to Popps Ferry Road, to be more residential, commercial, a mix of both? How would you describe it?

A.    There's only two businesses on it, so, I mean, it's kind of—there's houses on the left. There's a house on the right. There's a church and then two businesses. Other than that, I mean, it's streets. You don't really get into the thickness of a neighborhood or anything until you would have to turn off of Lamey Bridge. So I would say—because the majority of it, from the interstate down, is just an empty field to the right. And then to the left, there's a fire department, and then, you know, you have your roads, but there's only one house, like, in between the roads, and then the church and an empty parking lot. So it's not very condensed right there.

Sorenson testified that on the night of the pursuit, "traffic on Lamey Bridge Road . . . was pretty empty."

¶31.   Berry argues that the circuit court "erred in determining the 'type of neighborhood' factor weighed in favor of [Jackson County] because the pursuit did not traverse purely residential areas." Berry asserts that "there are many parks, schools, and playgrounds in the area," and "[i]t is well known skating rinks are destinations for children that could be in parking lots in and around the area." Berry further asserts that the circuit court ignored the

14

fact that there were many stoplights and intersections along the pursuit route.

¶32.	However, "[g]eneral allegations without precisely stated facts are insufficient to overcome a summary judgment motion." *Williamson ex rel. Williamson v. Keith*, 786 So. 2d 390, 395 (¶19) (Miss. 2001). In *Tennesen v. City of Hattiesburg*, 393 So. 3d 424, 434 (¶39) (Miss. Ct. App. 2022), *cert. denied*, 360 So. 3d 651 (Miss. 2023), the Tennesens asserted that the type-of-neighborhood factor weighed in their favor because the police pursuit occurred on a "Sunday afternoon in an area with churches, businesses, restaurants, gas stations, and hundreds, if not thousands, of cars," which "made the high-speed chase extremely dangerous . . . ." This Court found, however, that no evidence in the record supported the Tennesens' "overbroad statement as it relates to the particular circumstances during the pursuit." *Id.* The same is true here. Berry's general assertion that children may have been present or that certain businesses along the pursuit route may have been "packed" is insufficient to create a genuine issue of material fact regarding whether the officers acted in reckless disregard.

¶33.	In *Brister*, the pursuit occurred on a Thursday in mid-January at 11 a.m. The evidence was found sufficient to sustain a determination of reckless disregard where the pursuing officer was a "one month rookie," and "the pursuit route was heavily populated. The route took them through residential areas including apartment complexes, single-family housing and condominiums, a park, and even past an elementary school" at a time when school would have been in session. *Brister*, 838 So. 2d at 280 (¶21).

¶34.	Here, the pursuit occurred on a Monday night from 7:20 to 7:27 p.m. There was no testimony that the skating rink, baseball fields, or churches were occupied at that time or that

15

children were present, and the pursuing officers were experienced and familiar with the area. Captain Sears, who led the pursuit on the interstate, was a twenty-five-year veteran with the Jackson County Sheriff's Department, and Deputy Fisher, who led the pursuit through D'Iberville, had worked for the Jackson County Sheriff's Department for four years and testified that he was familiar with the roads along the pursuit route because he "grew up in the area." Supporting the lack of traffic, Fisher testified that Young was able to maneuver down Lamey Bridge Road for 0.6 miles without braking, and D'Iberville Officer Sorenson testified that "traffic on Lamey Bridge Road . . . was pretty empty." There was no testimony to show that law enforcement acted in a reckless manner or abandoned all care given the character of the neighborhood, nor is there a disputed genuine issue of material fact about the character of the neighborhood. Therefore, we cannot find anything that creates a genuine issue of material fact as to this factor.

### 3. Characteristics of the Streets

¶35. Considerations under this factor include whether "the streets were particularly hilly, curvy, or poorly maintained." *Gray*, 72 So. 3d at 498 (¶22); *Law*, 65 So. 3d at 829 (¶32) (considering under this factor that parts of the pursuit route were "hilly, bouncy, very rough" and another part was "in disrepair, with large potholes"). The testimony did not reveal any issues with the condition of the interstate or Lamey Bridge Road, which is a four-lane road.

### 4. Presence of Vehicular or Pedestrian Traffic

#### a. Interstate Pursuit

¶36. There was no evidence of pedestrian traffic on the interstate. The only evidence that

16

Berry points to regarding the presence of vehicular traffic on the eight-mile stretch of interstate is Captain Sears's statement in his investigative report. Sears stated, "As we neared exit 50 traffic had become more congested and the suspect vehicle was being driven more erratic with disregard for the welfare of surrounding vehicles and occupants."

¶37. However, Sears's report that traffic became "more congested" about four miles into the pursuit is insufficient here to support a finding of reckless disregard. There was no testimony regarding the amount of traffic on the interstate at any point during the pursuit; so it is not possible to define what "more congested" means.

¶38. Berry presented no evidence to support a finding that the officers acted with reckless disregard to the amount of traffic on the interstate. To the contrary, the testimony showed that the officers used care on the interstate, attempting to protect nearby motorists. Jackson County Deputy Hampton testified that as soon as Sears initiated the pursuit, he (Hampton) followed behind the pursuing vehicles, using his vehicle as a "rolling barrier" to prevent traffic from approaching from behind. Because officers did not "evince[] an entire abandonment of any care," *Presley*, 40 So. 3d at 523 (¶12), we find no genuine issue of material fact in dispute regarding the interstate pursuit.

### b. Non-Interstate Pursuit

¶39. The pursuit briefly detoured off the interstate when Young exited onto Washington Avenue in Ocean Springs. Young ran the red light at Washington Avenue and crossed six lanes of traffic before re-entering the interstate. Captain Sears testified that he had to stop and wait for traffic, and he "worried about stopping and not hitting nobody in that

17

intersection."

¶40.    D'Iberville Officer Krahenbuhl testified that when the pursuit reached the exit ramp toward Lamey Bridge Road, "[i]t was one of those breaks where the light down at Mallett was keeping traffic back so it wasn't heavy traffic, fortunately."  He further testified that he stopped traffic that may have been headed toward the pursuit after Young hit his patrol vehicle:

> As soon as . . . the suspect vehicle left and the other vehicles pursued, they went after him, I activated my lights to get out and look at my damage, because it felt like he ripped the front end off.  So I stopped the traffic.  That's why I turned on my lights, because I was sitting in their lane of southbound travel.

¶41.    D'Iberville Officer Sorenson testified that Lamey Bridge Road was "pretty empty" at the time the pursuit came through:

> Q.    . . . Going back to that night on the interstate, getting off into D'Iberville and Lamey Bridge Road area, would that have been—my question is specifically about the volume of the traffic that night in that area. Was it—I'm guessing it was probably pretty consistent with what it is every night in that area.
>
> A.    I guess it would depend on the time.  I know that on Lamey Bridge Road, I remember not having to really go around anything to get to everything, like the scene.  So traffic on Lamey Bridge Road, at the time I was driving down it, was pretty empty.

¶42.    D'Iberville Officer Krahenbuhl testified regarding the presence of vehicular traffic in the moments after Young crashed into the guardrail at the end of the ramp on the Lamey Bridge Road exit.  Krahenbuhl stated, "Of course, I want to protect the society, at large, but there was no traffic at that moment coming up the hill. . . .  I just positioned my car to be able to effect and assist with the arrest . . . ."

¶43. Finally, Deputy Fisher testified that he did not see any pedestrians on Lamey Bridge Road while pursuing Young.

¶44. Berry argues that Jackson County's description in its findings of fact, which were adopted by the circuit court, that Young "erratically weaved through traffic" on Lamey Bridge Road "is an admission there was traffic congestion on Lamey Bridge Road during the pursuit and Young was driving erratically and dangerously through the traffic." Berry further cites Deputy Fisher's testimony regarding the traffic on Lamey Bridge Road:

> The traffic flow through that area into the Promenade is heavy. D'Iberville was already there at the top of Lamey Bridge. . . . [T]hey had units on scene. My concern going into an area like that is just the flow of traffic that's present, you know. You have got a skating rink that's right there at that corner, you know. And that skating rink is always packed. They're always doing events and special, you know, things there with kids and everything. So going south on Lamey Bridge, that's when my heart sank, because—I said, this needs to stop. It's got to stop now.

¶45. Despite Fisher's concern about the skating rink, there was no testimony as to whether it was occupied on the night in question. Rather, all we have is his generalized statement that the skating rink was "always packed." The same is true for the other venues on Lamey Bridge Road. Although there were concerns in the area due to the presence of a ballfield, park, and church, there was no testimony that any of these venues were in use that Monday night in October at approximately 7:25 p.m. In fact, Officer Sorenson testified that traffic was "pretty empty" at the time of the pursuit, and Deputy Fisher testified that Young was able to maneuver down Lamey Bridge Road for 0.6 miles without braking. Further, Fisher went on to testify that despite any concerns about the area, he was justified in pursuing Young down Lamey Bridge Road after Young had almost backed into an officer and struck

19

another officer's vehicle: "But at that moment, you know, I was at the point of no return. I had to see it through based on the information that I had."

¶46. Regardless, any officer's opinion on whether the pursuit should have continued or stopped is irrelevant. *See City of Jackson v. Shavers*, 97 So. 3d 686, 691 (¶18) (Miss. 2012) ("[N]otwithstanding [the expert witness's] opinion [to the contrary], our precedent makes it clear that the officers in this case did not act with reckless disregard."). Rather, our determination is limited to whether officers demonstrated reckless disregard by acting with "a conscious indifference to consequences, amounting almost to a willingness that harm should follow," *Durn*, 861 So. 2d at 995 (¶10), and abandoning "any care" for the safety of the public. *Presley*, 40 So. 3d at 523 (¶12). There is no factual dispute or probative evidence regarding the amount of traffic on Lamey Bridge Road that demonstrates that law enforcement abandoned all care in pursuing Young 0.6 miles down Lamey Bridge Road.

### 5. Weather Conditions and Visibility

¶47. The parties agree that the weather was clear and that visibility was good despite the pursuit occurring at night. There was no proof of rain or slick conditions that would be relevant to this factor.

### 6. Seriousness of the Offense

¶48. Captain Sears initially attempted a traffic stop for the misdemeanor offense of driving with a stolen license plate. Berry's expert on police pursuits, Dennis K. Waller, opined that law enforcement should never pursue a vehicle for a misdemeanor. Berry points to the testimony of several officers who stated their opinion that they would have terminated the

20

pursuit had they been pursuing a suspect for a stolen license plate rather than a stolen car. Sergeant Moran, the commanding officer of the D'Iberville Police Department, stated that he would not get involved in a pursuit over a stolen tag, and he ranked a stolen tag as low on the spectrum of crimes. Jackson County Deputy Fisher, who led the pursuit down Lamey Bridge Road, also testified that he would not have initiated the pursuit based on a stolen tag:

> You know, the things that could happen as a result of a pursuit, had I known that it was just a misdemeanor stolen tag, you know, I'm not going to pursue that vehicle for a misdemeanor tag and risk other things happening. But if it's a stolen vehicle, then that's a felony. That's different. But just based off of being a stolen tag, why am I going to put the public in danger over a misdemeanor stolen tag that might not even be malicious? . . . It could have been a clerical error. But again, based on how they are driving, all that comes into effect. Me, personally, I would have terminated the pursuit.

He testified that in his opinion, the pursuit of a vehicle across the county line into D'Iberville for a stolen tag exhibited a reckless disregard for the public's safety.

¶49. Jackson County had no policy in place at the time of this pursuit prohibiting pursuit when the initial cause for the traffic stop was a misdemeanor. Further, while the misdemeanor was the reason for the attempted traffic stop, Captain Sears testified that he pursued Young for felony fleeing once Young "began eluding [him] and driving recklessly." After Young crashed into the guardrail on Lamey Bridge Road, officers testified that the pursuit was continued because Young struck an officer's patrol car, committed aggravated assault of a law enforcement officer, which is a felony, by backing his car up toward the officers, and fled the scene of a felony.

¶50. The opinion of Berry's expert and the opinions of the officers that the pursuit should not have occurred based on a misdemeanor is irrelevant for our analysis. The standard is not

21

what another person believes to be reasonable during a pursuit, and we are not bound by a witness's opinion on the facts of the case. *Shavers*, 97 So. 3d at 691 (¶18) (stating that reckless disregard may be found "notwithstanding [the expert witness's] opinion" to the contrary). Rather, the standard is whether the pursuing officers acted with reckless disregard for the safety and well-being of anyone in the path of the pursuit not involved in a criminal activity. Viewing the evidence in the light most favorable to Berry, no evidence has been presented to show there is a disputed issue of material fact regarding whether officers should have terminated the pursuit once Young fled and after Young almost struck an officer with his car and ran into another officer's patrol vehicle.

### 7.     Use of Sirens and Blue Lights

¶51.    The parties agree that the officers used their sirens and blue lights at all times during the pursuit. *See Phillips*, 368 So. 3d at 326 (¶32) (stating that the use of lights and sirens demonstrates "some measure of safety precaution").

### 8.     Available Alternatives to Pursuit

¶52.    Factors that may favor termination of a pursuit include whether the suspect is known to law enforcement officers and whether the suspect can be feasibly apprehended at a later time. In *Brister*, the Supreme Court considered that the suspect's "vehicle was the only one in the parking lot and although the officers could have blocked in her vehicle at the bank parking lot, they did not. They could have easily written down the tag number there instead of attempting such in a hot pursuit chase." *Brister*, 838 So. 2d at 280 (¶21). Likewise, in *Lewis*, the officer "did not avail himself of a very ready means of potentially identifying the

suspect, the tag number of the car he was driving." *Lewis*, 153 So. 3d at 699 (¶23). In *Richardson*, the court considered that "[t]he officer was not in pursuit of an unknown suspect. In fact, the officer had previous encounters with [the suspect,] Evans, knew where Evans lived, knew Evans's mother, and knew that Evans was likely to try to avoid arrest . . . ." *Richardson*, 913 So. 2d at 978 (¶17).

¶53.    Here, no evidence was presented that reasonable alternative means to capture Young existed. Berry speculates that officers could have used the license plate numbers on the vehicle or could have obtained surveillance footage from houses and businesses to track Young's whereabouts. But the evidence contradicts Berry's speculation. When asked if there were alternative means to capture Young other than pursuit, D'Iberville Officer Krahenbuhl testified as follows:

> Q.    Give me some alternatives. What else can you do? If you terminate it, that's not the end of it, necessarily, right? You could still catch the guy through other means. That's what my question is. Go through some of those other means.
>
> A.    You know, getting more information on the plate, where it was stolen. Maybe some way of identifying a person and picking him up later. That's ideally the best way, when we cancel pursuit, is we've at least got enough information to pursue it later, just low key, just go to whatever their registered address is or whatever. But, again, you've got a switched or stolen plate, it's going to be hard to get any information unless he had some preexisting, I guess.

Captain Sears testified, "Would we have caught him another day? No, we would not have because he did have a switched tag, and we found out later had a stolen vehicle . . . ."

¶54.    Despite Berry's assertion that a "myriad of alternatives" were available, it is undisputed that Young's identity was unknown and that the license plate on the vehicle was

23

stolen and could not be used to verify Young's identity or usual location. Further, there is no support for Berry's assertion that Young could have been located through various surveillance footage. Any alternative means to capture Young other than pursuit are speculative at best. Considering the circumstances, Berry has presented no genuine issue of material fact on this factor.

### 9. Police Policy Prohibiting Pursuit Under the Circumstances

#### a. Balancing Test

¶55. Berry argues the pursuit violated Jackson County's balancing test in its department pursuit policy, which states: "The officer's conclusion that the immediate danger to the public or the officer created by the pursuit, is less than the immediate or potential danger to the public should the suspect remain at large."

¶56. Berry asserts that the testimony of Captain Sears, Deputy Fisher, D'Iberville Officer Krahenbuhl, and Lieutenant Jason King of the D'Iberville Police Department, as well as her expert, Waller, establishes that the immediate danger created by the pursuit outweighed the immediate danger of Young remaining at large.

¶57. When Sears was interviewed by the Mississippi Bureau of Investigations, he stated:

> As we came up on 46, to be honest with you, I was hoping he went I-10 because I was going to call the pursuit at that time. If he had continued I-10, I would have probably let him go and came back for him another day, but he shot up the ramp, so we all shot up the ramp.

In his deposition, Sears testified that he considered terminating the pursuit when approaching both Biloxi and D'Iberville. He said he thought that "if [Young] continues [on] I-10, I'm just

24

going to cut him loose" because "the guy was getting way too reckless, and to continue into I-10, through I-10, he was probably going to slow down if we backed off, and had got off somewhere, and left." He testified that he would have "terminated" and "let Biloxi take over" because he did not want to pursue "completely out of jurisdiction." However, Young did not continue on I-10. He exited into D'Iberville, and law enforcement made the "split second" decision to follow him. Sears testified:

> Q.      . . . [Y]ou are in Harrison County now, and you are approaching Exit 46. You are already thinking, I might terminate this pursuit if he continues. When he got off at Exit 46, why not just let him go? Why not let D'Iberville handle it from there?

> A.      That would probably have been the ultimate way to end this, but unfortunately, it did not end like that. And, again . . . , microseconds. By the time he jumped that ramp until the end of pursuit was about seven, eight, ten seconds, I would say.

¶58. Deputy Fisher with the Jackson County Sheriff's Department testified that based on the fact that the pursuit started with a stolen tag, he "would have disengaged from the pursuit, regardless of how many other people were in it." He believed that the decision to cross county lines into D'Iberville exhibited a reckless disregard for the safety of the public. D'Iberville Officer Krahenbuhl testified, "I would probably not want to [continue the pursuit], but that's just me." Jackson County Sheriff's Deputy Hampton also believed that the pursuit should have been terminated at the county line. However, he acknowledged that the circumstances changed:

> [U]nder the circumstances, at the county line, yeah, we should have terminated it. But when he got into Harrison County, and he struck that guardrail, and struck that police officer, it changed. It became a felony.

25

Berry additionally cites D'Iberville Lieutenant King's testimony that sometimes if a pursuit can be stopped "in a more controlled fashion, we can put an end to it. We don't need that car speeding through our city."

¶59. Berry's expert, Waller, opined that Jackson County ignored its duty to consider the balancing test, and in his opinion, Sears should have terminated the pursuit:

> During the pursuit Young's driving was considered reckless as he was driving off the roadway, driving in and out of traffic, and attempted to ram police vehicles on two occasions. Also, according to rough time/distance calculations, Young and the pursuing law enforcement vehicles were driving at extremely high speeds. . . . Capt. Sears felt the driver would probably slow down if the [Jackson County Sheriff's Department] squads backed off and exited the interstate. However, Capt. Sears did not direct the pursuit be terminated. As a result, Young was pursued into D'Iberville where he crashed into an uninvolved vehicle and seriously injured the driver.

Waller concluded that "JCSO personnel ignored important tenets of the policy designed to promote the safety of the public. In actual fact the policy served as little more than window dressing. It and other JCSO policies were ignored with impunity."

¶60. Again, much of Berry's argument is based on opinion testimony as to how the pursuit, in hindsight, should have been handled. However, the opinions of the officers and even Berry's expert do not give the standard. *Shavers*, 97 So. 3d at 691 (¶18) ("[N]otwithstanding [the expert witness's] opinion [to the contrary], our precedent makes it clear that the officers in this case did not act with reckless disregard."). Rather, we must examine the evidence to determine whether a genuine issue of material fact exists regarding whether the officers acted in reckless disregard for the safety of the public. The officers chose to pursue Young because there were no reasonable alternative means to detain Young other than immediate

26

capture, and Young was driving erratically. Further, the testimony showed that the officers were concerned for the safety of Young's passenger, and this concern factored into their decision to continue the pursuit. Captain Sears testified, "We don't know if that guy has guns. He had a passenger. We don't know if that passenger is being held hostage. So we, as officers, at that moment, have to make a decision of what to do." Deputy Nutefall also expressed concern that the passenger could have been kidnapped or in danger. He testified that when he passed Young to attempt a rolling roadblock, he could see a "female on the passenger side, I see her hit him, like, you know, I guess telling him to stop or whatever." Officers then made the split-second decision to continue to pursue Young after he nearly backed into an officer with his car. "[The] determination of the nature of the officers' actions is judged on an objective standard with all the factors that they were confronted with, taking into account the fact that the officers must make split-second decisions." *City of Jackson v. Jackson*, 200 So. 3d 1141, 1145 (¶12) (Miss. Ct. App. 2016) (quoting *City of Jackson v. Powell*, 917 So. 2d 59, 72 (¶47) (Miss. 2005)).

¶61. Officers balanced the immediate danger to the public, and specifically Young's passenger, with the danger of the pursuit. They took steps to protect the public, such as attempting to keep Young on the interstate, attempting to block in Young's vehicle after he crashed into the guardrail, and blocking traffic from coming toward the pursuit. They also considered that there were no other reasonable means to capture Young because his identity was unknown, and the vehicle's tag was stolen. Because the officers considered the safety of the public and Young's passenger and did not act with "a conscious indifference to

27

consequences, amounting almost to a willingness that harm should follow," *Durn*, 861 So. 2d at 995 (¶10), we cannot find that a genuine issue of material fact exists as to this factor.

**b.** **Alleged Violations of Department Policy**

¶62. Berry argues that other violations of department policy occurred because (1) more than two officers pursued Young; (2) officers used rolling roadblocks; (3) deadly force was used; and (4) proper means of communication with dispatch were not followed.

¶63. Regarding the number of officers allowed to pursue a suspect, Jackson County's policy states that "[p]ursuits are normally limited to no more than two emergency vehicles, a primary and a secondary (back-up) unit. Other support units should stay clear of the pursuit unless requested to participate by the controlling supervisor." Berry asserts that the testimony showed that five vehicles were pursuing Young, in direct violation of Jackson County's policy. While multiple vehicles were involved in the pursuit, the officers testified that two of them actively pursued Young, and the others followed. Captain Sears testified:

> I take it, pursuit is contact with the suspect vehicle, actively pursing. Actively pursuing. I mean, once I lost, I didn't pursue. I followed. I followed, and I'm sure the other two who were behind me followed me to render any necessary assistance once they got the suspect vehicle stopped. So I don't think there was five actively in this pursuit on this particular night at any one time, no, sir.

¶64. As to the use of rolling roadblocks, Berry asserts that at the time of the pursuit, Jackson County's policy required authorization from a supervisor before roadblocks were used. Berry also cites Jackson County's pursuit policy, effective June 1, 2018 (twenty months after the pursuit), which states that "[m]oving or following roadblocks are not authorized." Berry further argues that the court should have considered that Deputy Nutefall

28

fired his weapon at a moving vehicle without authorization from a supervisor and in violation of department policy, which resulted in an investigation into Nutefall's actions. Finally, Berry argues that dispatch did not designate a controlling officer as required by the communications policy, and personnel not involved in the pursuit were using the radio channel, preventing effective communication.

¶65. "An officer's failure to follow official policy does not automatically constitute reckless disregard." *City of Jackson v. Johnson*, 343 So. 3d 356, 378 (¶57) (Miss. 2022); *see also Miss. Dep't of Wildlife, Fisheries & Parks v. Webb*, 248 So. 3d 772, 779 (¶12) (Miss. 2018) ("Mississippi precedent establishes that a violation of a SOP does not alone establish reckless disregard." (citing *Presley*, 40 So. 3d at 524 (¶16))). Violation of a department policy is not necessarily outcome-determinative. Even assuming that officers did violate department policy, as Berry alleges, it is unclear how these policy violations would create a genuine issue of material fact or that any of the alleged policy violations proximately caused the accident and Berry's injuries. Rather, the totality of the circumstances must be considered. Given that Young's identity was unknown and officers were concerned for the passenger's safety, the officers' actions did not exhibit a reckless disregard. Importantly, there was no policy prohibiting the pursuit, and at no point did the officers continue the pursuit without authority.

### 10. Rate of Speed

¶66. Young traveled at speeds of 85 to 90 miles per hour on the interstate, where the speed limit was 70 miles per hour. On Lamey Bridge Road, he traveled at 40 to 50 miles per hour

for 0.6 miles, and the posted speed limit was 30 miles per hour. Nothing about continuing the pursuit at these speeds was shown to exhibit an abandonment of care.

## B. Totality of the Circumstances

¶67. To survive summary judgment, Berry, as the nonmoving plaintiff, has "the burden of producing sufficient evidence of the essential elements of her claim at the summary-judgment stage, as she would carry the burden of production at trial." *Karpinsky*, 109 So. 3d at 89 (¶13). Under the MTCA, Berry was required to prove that the officers acted with reckless disregard, meaning "a conscious indifference to consequences, amounting almost to a willingness that harm should follow." *Durn*, 861 So. 2d at 995 (¶10). Berry states that two pieces of evidence demonstrate sufficient evidence to support her assertion that the Jackson County Sheriff's Department acted with reckless disregard for her safety: (1) "the affidavit of Appellant's nationally recognized expert in the field of police tactics and pursuits" and (2) the "sworn testimony from multiple officers involved who believed the pursuit should have been terminated before crossing county lines."

¶68. Berry's argument fails. The opinion of Berry's expert and the opinion of the officers that the pursuit should have ended at the county line is not the standard by which pursuits are judged. Rather, the protections afforded to governmental entities under the MTCA will be lifted only if the plaintiff can sustain the burden of producing evidence of the high standard of reckless disregard under the totality of the circumstances. *Gray*, 72 So. 3d at 495 (¶13).

¶69. When Captain Sears attempted to initiate the traffic stop, Young sped up and began driving erratically. Sears testified that "at that time, during that pursuit, any other person, if

30

you hit the blue lights on them and it's a switched tag, will pull over and we'll talk about it." But, according to Sears, "instead of stopping, like a normal citizen would have done," Young sped off and weaved in and out of traffic. Sears became concerned that Young fled because "[t]here could be more going on behind the scene." Sears explained, "We don't know if that guy has guns. He had a passenger. We don't know if that passenger is being held hostage. So we, as officers, at that moment, have to make a decision of what to do. Other officers are going to close in because we want to make sure that nothing—you know, nothing occurs . . . ." Sergeant Nutefall testified that when he pulled ahead to attempt to stop Young while he was still on the interstate by performing a rolling roadblock, he saw the passenger hit Young. Nutefall testified,

> When he comes up to get up by me, I'm getting up beside him, he's riding on the shoulder and, you know, he's looking at me—or he's looking at us like we're stupid, the driver is. The male, unknown male. The female on the passenger side, I see her hit him, like, you know, I guess telling him to stop or whatever.

Nutefall testified that he was not sure if the passenger had been kidnapped.

¶70. Jackson County's pursuit policy in effect at the time stated that a pursuit may be initiated when a "[s]uspect exhibits intention to avoid apprehension by refusing to stop when properly directed to do so." Both Captain Sears and Deputy Fisher, the lead pursuing officers, were experienced law enforcement officers and were familiar with Jackson County's policies and the roads where the pursuit occurred, and no evidence was presented that any of the officers involved acted in reckless disregard during the pursuit.

¶71. In *Johnson v. City of Cleveland*, 846 So. 2d 1031, 1036 (¶15) (Miss. 2003), the

31

Supreme Court reversed a grant of summary judgment where there were "critical factual disputes" in the evidence. Specifically, one of the responding officers "made conclusory statements during his deposition to the effect that his blue lights were activated," but other testimony "clearly dispute[d]" the officer's testimony. *Id.* "This conflicting testimony created a material factual dispute that must be resolved by the trier of fact, but only after a full evidentiary hearing by way of a bench trial." *Id.*

¶72. Here, there is no such conflicting evidence. The material evidence in this case is not in dispute, and under the totality of the circumstances, no evidence has been presented to show that the pursuing officers acted with reckless disregard—a standard higher than gross negligence and embracing willful or wanton conduct, which requires knowingly or intentionally doing a wrongful act, *Gray*, 72 So. 3d at 495-96 (¶13)—to Berry's safety and well-being. Even if the officers' actions were negligent, such a finding would be insufficient because under the MTCA, "immunity lies for negligence." *Durn*, 861 So. 2d at 995 (¶10). Immunity also lies for "mere mistake or poor judgment." *Phillips*, 368 So. 3d at 327 (¶34). Rather, Berry was required to prove that the officers demonstrated "a conscious indifference to consequences, amounting almost to a willingness that harm should follow." *Durn*, 861 So. 2d at 995 (¶10).

¶73. In *Presley*, 40 So. 3d at 524 (¶17), the Supreme Court found that where an officer's actions demonstrated "some measure of safety," the facts did not support a finding of reckless disregard. The facts of *Presley* do not involve a police pursuit; rather, the plaintiff, Lynda Presley, was injured when her vehicle collided with the vehicle of a police officer who

32

was responding to a service call. *Id.* at 521 (¶5). However, the same analysis applies regarding the heightened standard that must be shown to establish reckless disregard.

¶74. In *Presley*, on a Wednesday at approximately 5:30 p.m., Jackson Police Department Officer Miranda Morton received a call that a man was "lying in the street . . . , unresponsive and bleeding." *Id.* (citing *City of Jackson v. Presley*, 40 So. 3d 578, 579 (¶2) (Miss. Ct. App. 2009), *rev'd*, 40 So. 3d at 524 (¶18)). Traffic was "heavy," and after unsuccessfully attempting to take an alternate route, Officer Morton entered "the busy 'five-points' intersection, where the traffic signal facing her was red . . . , with her blue lights and her siren and buzzer on, at approximately five miles per hour." *Id.* at (¶3). She traveled through the intersection one lane at a time, and the vehicles in the first two lanes stopped. *Id.* at (¶4). However, her view of the third lane was blocked by a large truck in the second lane, and when she proceeded into the third lane, her and Presley's vehicles collided. *Id.* Presley did not see or hear the patrol car before the accident. *Id.* The trial court found the facts were sufficient to support a finding that Officer Morton acted in reckless disregard for the safety of others, and this Court affirmed. *Id.* at (¶1). The Supreme Court reversed, finding that Officer Morton's actions did not meet the "*extremely high bar*" for recovery under section 11-46-9(1)(c). *Id.* at 523-24 (¶¶12, 18) (emphasis added).

¶75. The Supreme Court explained that because Officer Morton "exercised *some measure of safety precaution* by employing her blue lights and siren, activating her buzzer to alert traffic while she was crossing the lanes, and crossing one lane at a time," and because she "attempted to take alternate routes before she proceeded to the five-points intersection,"

which she knew to be "a dangerous and high-risk intersection," "[s]uch actions hardly can be characterized as reckless and indifferent to the safety of others." *Id.* at 524 (¶17) (emphasis added). The Supreme Court consequently found "*as a matter of law* that [the officer's] actions [did] not 'evince an abandonment of all care,' or show a 'conscious indifference to consequences, amounting almost to a willingness that harm should follow,' or that her actions were worse than gross negligence." *Id.* (emphasis added); *see also Phillips*, 368 So. 3d at 321 (¶14) (affirming a finding of no reckless disregard where the officer "exhibited some care" and, therefore, "did not show a conscious indifference to consequences"); *Maldonado v. Kelly*, 768 So. 2d 906, 910-11 (¶¶11-12) (Miss. 2000) (affirming a finding of no reckless disregard where an officer "stopped, looked both ways, [and] saw nothing" before driving through an intersection and colliding with another vehicle); *McKay v. Choctaw County*, 312 So. 3d 404, 413 (¶31) (Miss. Ct. App. 2021) (affirming a finding of no reckless disregard where the officer "exercised at least *some care*").

¶76. In the present case, the evidence showed that the officers used caution during the pursuit. It is undisputed that the officers activated their lights and sirens, attempted to prevent other vehicles from entering the path of the pursuit, attempted to keep Young on the interstate and out of the cities, attempted to block in Young's vehicle once he crashed into the guardrail, considered that Young's passenger could be in danger, and determined that there were no other reasonable alternative means to capture Young, whose identity was unknown. The officers also balanced the immediate need to capture the unknown suspect

34

with the safety of the public. Considering the totality of the circumstances, the undisputed facts before us demonstrate that the officers "exercised some measure of safety precaution" with regard to each of the applicable *Richardson* factors, which "as a matter of law" establishes that the officers did "not 'evince an abandonment of all care,' or show a 'conscious indifference to consequences, amounting almost to a willingness that harm should follow,' or that [their] actions were worse than gross negligence." *Id.*

¶77. Taking the evidence in the light most favorable to Berry, "no genuine issue of material fact" exists to support a finding of reckless disregard. M.R.C.P. 56(c). Therefore, as a matter of law, Berry's claim fails under the MTCA, and we find summary judgment was appropriately granted.

## II. Two Distinct Pursuits

¶78. Berry argues that the circuit court committed reversible error in finding that two distinct pursuits occurred—the initial pursuit on the interstate for a stolen tag and the pursuit on Lamey Bridge Road for aggravated assault of a law enforcement officer. Berry argues that the pursuit must be considered as one because "there was no long pause or termination of the pursuit after Young crashed into the overpass guard rail"; rather the gap between the pursuits was "milliseconds," and Berry's injury was a foreseeable result of the initial pursuit. Presumably, Berry's argument is that even if the pursuit on Lamey Bridge Road was justified, the initial pursuit was not, and the two pursuits cannot be separated. Berry asserts:

> [T]he initial pursuit for a stolen tag was the proximate cause of the injuries to Plaintiff. If the original pursuit had been terminated in a timely manner, there would have never been a crash on Lamey Bridge Road. If the pursuit did not cross into Harrison County, Young would have never backed into a DPD

police vehicle on the overpass.

¶79.  We find no merit to this argument.  Regardless of whether the pursuits are considered together or separately, Berry has failed to show a genuine issue of material fact on the key issue of reckless disregard.  Therefore, whether one or two pursuits occurred is irrelevant, and the circuit court did not commit reversible error on this issue.

### III.  Reliance on Subsequent Investigation and Grand Jury Proceedings to Justify Continuing the Pursuit Retroactively

¶80.  On February 11, 2020, Berry and Jackson County filed a joint "Stipulation," stipulating to two exhibits as true and correct.  The first exhibit was the indictment returned against Young for felony fleeing or eluding law enforcement on the night his vehicle struck Berry.  The second exhibit was Young's indictment for the failure to stop a motor vehicle pursuant to the signal of a law enforcement officer on the night in question.  Citing the stipulation, the circuit court's findings of fact state:

> Significantly, a duly-empaneled Grand Jury for Jackson County, Mississippi, indicted Young on October 5, 2018, for Felony Fleeing or Eluding pursuant to Miss. Code Ann. § 97-9-72(2). . . .  The Jackson County Indictment also charged Young for being in Possession of Stolen Property (a 2004 Ford Ranger pickup) pursuant to Miss. Code Ann. § 97-17-70.

¶81.  Berry argues that "[a] grand jury indicting a suspect is not relevant evidence in a MTCA police pursuit case," and "[a] trial court should not consider post hoc determinations of a criminal case in reviewing the civil case."  Berry asserts that the circuit court erred in not limiting its consideration to the facts known to the officers at the time of the pursuit.

¶82.  Jackson County did not respond to this argument in its brief.  Failure to respond to an argument raised by the appellant "is tantamount to confession of error and will be accepted

36

as such." *Turner v. State*, 383 So. 2d 489, 491 (Miss. 1980). However, it is unclear why Berry takes issue with the circuit court's citation of the indictments when Berry herself stipulated to their inclusion in the record. Further, the only new information contained in the indictment is that the Ford Ranger that Young was driving was stolen. While the only information that Captain Sears had when he attempted to stop Young was that the vehicle's license plate was stolen, Sears testified that Young's reaction to the attempted traffic stop immediately led him to believe something else was amiss.

¶83. Regardless, the circuit court's citation of the indictments is not dispositive, as ample evidence supports the circuit court's conclusion that the pursuing officers did not act in reckless disregard for the safety of the public in pursuing Young.

**CONCLUSION**

¶84. "In considering summary judgment motions, the . . . court does not try the issues, it only determines if there are issues to be tried." *Est. of Biddle v. Biddle*, 369 So. 3d 525, 529 (¶13) (Miss. 2023). Berry has presented no evidence demonstrating that Jackson County acted in reckless disregard of her safety. Therefore, there are no issues to be tried, and we find the circuit court correctly granted summary judgment in favor of Jackson County. The circuit court's decision is affirmed.

¶85. **AFFIRMED.**

**CARLTON, P.J., McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. WILSON, P.J., AND McDONALD, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE AND SMITH, JJ., NOT PARTICIPATING.**